**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| Machinery Solutions, Inc., ) | Civil Action No.  3:15-cv-03447-JMC |
| ) | |
| Plaintiff, ) | |
| ) | **ORDER AND OPINION** |
| v.     ) | **ON PLAINTIFF'S MOTION FOR** |
| ) | **PRELIMINARY INJUNCTION** |
| Doosan Corporation, Doosan Group, Doosan ) | |
| Infracore, Doosan Infracore America ) | |
| Corporation, Ellison Technologies, Inc., ) | |
| Mitsui & Co., LTD, Mitsui & Co. (USA), ) | |
| Inc. and John Doe, ) | |
| ) | |
| Defendants. ) | |
| ) | |

      Plaintiff Machinery Solutions, Inc. ("Plaintiff") filed this action seeking damages and to enjoin Defendants Doosan Corporation, Doosan Group, Doosan Infracore, and Doosan Infracore America Corporation (collectively "Doosan"), Ellison Technologies, Inc. ("Ellison"), Mitsui & Co., LTD, Mitsui & Co. (USA), Inc. and John Doe (collectively "Defendants") from, among other things, terminating Plaintiff's contract with Doosan and allowing Ellison to become Doosan's dealer.[1]  (ECF No. 1-1.)

      This matter is before the court pursuant to Plaintiff's Motion for Temporary (or Preliminary) Injunction against Doosan and Ellison (the "PI Motion").  (ECF No. 4.)  For the reasons set forth below, the court **DENIES** Plaintiff's PI Motion.

---

[1] As of the date of this Order, Defendants Doosan Corporation, Doosan Group, Doosan Infracore, Mitsui & Co., LTD, Mitsui & Co (USA), Inc. and John Doe have not been served.  Plaintiff asserts that these remaining Defendants are foreign corporations registered in either the Republic of Korea or Japan and they must be served through the Hague Convention.  (ECF No. 15 at 4.)

## I.     RELEVANT BACKGROUND TO PENDING MOTION

1. Doosan manufacturers machine tools that cost tens or hundreds of thousands of dollars. (ECF No. 25-1 at 3 (Lattie Dec.) ¶¶ 8–9.)

2. Plaintiff alleges that it has had an ongoing contractual relationship since 1997 with Doosan. (ECF No. 1-1 at 7 ¶ 17).

3. Plaintiff and Doosan are parties to a "Letter of Understanding" or Distribution Agreement for the distribution of new machine tools from Doosan. (ECF No. 1-1 at 22–25.)

4. Pursuant to the Distribution Agreement, Plaintiff sells new Doosan machines in North Carolina, South Carolina, and Georgia.[2] (E.g., ECF No. 1-1 at 22 ¶ III; ECF No. 1-2 at 6 (Amick Aff.) ¶ 5.)

5. Pursuant to the terms of the Distribution Agreement, either party may terminate the agreement, at any time for any reason whatsoever, by giving the other party at least 30 days' prior written notice. (ECF No. 1-1 at 24 ¶ XIII.)

6. Pursuant to the terms of the Distribution Agreement, Plaintiff agreed that it would not promote or sell any competitive products of Doosan unless mutually agreed upon by Doosan and Plaintiff. (ECF No. 1-1 at 23 ¶ XII.)

7. Plaintiff sells new machine tools from other manufacturers, and it sells and services used machine tools. (ECF No. 1-2 at 6 (Amick Aff.) ¶ 5; ECF No. 25-1 at 5 (Lattie Dec.) ¶ 20 and 6 ¶¶ 22–23.)

8. On August 24, 2015, Plaintiff received a letter from the President of Doosan Infracore America Corporation in which he communicated the intent of Doosan Infracore America Corporation to terminate the contractual relationship with Plaintiff. (ECF No. 1-1 at

---

[2] Further, the Distribution Agreement does not provide Plaintiff the exclusive right to sell Doosan's machine tools in the specified territory. (ECF No. 25-1 (Lattie Dec.) at 4 ¶¶ 15-16.)

28.)

9.     The letter stated that Plaintiff would have 30 days to finalize all existing projects, and after that time Plaintiff must cease pursuing any future business or representing that Plaintiff is an authorized Doosan dealer.[3]  (<u>Id.</u>)

10.    The letter also included an attachment entitled "Conduct of Business During Transition Period."  (ECF No. 1-1 at 29–30.)

11.    This attachment identified Ellison as a new Doosan dealer in North Carolina, South Carolina, and Georgia.  (ECF No. 1-1 at 30 ¶ 6.)

12.    Ellison has agreed to become an exclusive Doosan dealer in markets across the country.  (ECF No. 26–1 at 3 (Odell Dec.) ¶ 5 through 4 ¶ 8; ECF No. 25-1 at 6 (Lattie Dec.) ¶ 24 through 7 ¶ 27.)

13.    Effective on September 1, 2015, through Ellison's dealership in Charlotte, North Carolina, Ellison became a dealer for Doosan machine tools servicing customers in North Carolina, South Carolina, and Georgia.  (ECF No. 26–1 at 4 (Odell Dec.) ¶¶ 9–10.)

14.    Pursuant to the contract between Ellison and Doosan, Ellison agreed to purchase inventory from Doosan and keep that inventory at the dealership until Ellison sells it to customers.  (ECF No. 26–1 at 3 (Odell Dec.) ¶¶ 5–7; ECF No. 25-1 at 6 (Lattie Dec.) ¶ 24 through 7 ¶ 27.)

15.    Ellison has purchased $2.2 million in Doosan machines as inventory for its Charlotte dealership.  (ECF No. 26–1 at 4 (Odell Dec.) ¶¶ 9–10.)

16.    In response to the letter terminating the Distribution Agreement, Plaintiff filed a

---

[3] The 30 day deadline expires on September 20, 2015.  The court observes that Doosan's attorney reiterated that Plaintiff's existing orders "are going to be honored and also certain businesses are going to be protected."  (ECF No. 31 (Hr'g Tr.) at 27:18–25.)

3

Complaint and Motion for Temporary Restraining Order, Temporary (or Preliminary) Injunction, and Rule to Show Cause in the Court of Common Pleas for Lexington County, South Carolina on August 25, 2015. (ECF Nos. 1-1 & 4.)

17.    On August 27, 2015, Doosan Infracore America Corporation removed Plaintiff's action from state court to this court on August 27, 2015, pursuant to 28 U.S.C. § 1332, claiming that "this civil action is 'between citizens of different States' and the amount 'in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.'"[4] (ECF No. 1 at 2 ¶ 3 (quoting 28 U.S.C. § 1332(a)(1)).)

18.    On August 31, 2015, the court denied Plaintiff's Motion for Temporary Restraining Order and Rule to Show Cause. (ECF No. 8.) The court held in abeyance its ruling on Plaintiff's PI Motion and directed the parties to submit any and all documentation supporting or opposing Plaintiff's PI Motion by certain dates. (Id.)

19.    Thereafter, the court conducted a hearing on the PI Motion on September 15, 2015. (ECF No. 30.)

## II.    LEGAL STANDARD AND ANALYSIS

A.    Preliminary Injunctions Generally

20.    The court's authority to issue preliminary injunctions arises from Fed. R. Civ. P. 65. However, "[p]reliminary injunctions are not to be granted automatically." Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980). A party seeking a preliminary injunction must establish the following four elements: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his

---

[4] In the Notice of Removal, Doosan Infracore America Corporation stated that (1) Plaintiff had served the Complaint on Ellison Technologies, Inc., which consented to the removal "[u]pon information and belief" and (2) the remaining Defendants had not been served and therefore their consent was not required under 28 U.S.C. 1446(b)(2)(A). (ECF No. 1 at 3 ¶ 5.)

4

favor; and (4) an injunction is in the public interest. <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008); <u>The Real Truth About Obama, Inc. v. Fed. Election Comm'n</u>, 575 F.3d 342, 346–47 (4th Cir. 2009).

21.     The court may only grant a preliminary injunction under the strict conditions set forth above. Fed. R. Civ. P. 65. The Fourth Circuit no longer recognizes a "flexible interplay" among the four criteria for a preliminary injunction. <u>Real Truth</u>, 575 F.3d at 347. Each requirement must be fulfilled as articulated. <u>Id.</u> at 346. If Plaintiff fails to meet any of the elements required for preliminary relief, the preliminary motion should be denied.

B.     <u>Plaintiff's Requested Relief</u>

22.     Plaintiff seeks a Preliminary Injunction that:

(a) enjoins Doosan from terminating the contractual relationship between Doosan and Plaintiff;

(b) enjoins Doosan from refusing to accept and honor orders that Plaintiff submits;

(c) enjoins Doosan from establishing Ellison as a Doosan dealer in South Carolina, North Carolina, and Georgia;

(d) enjoins Ellison from contacting any of Plaintiff's customers in South Carolina, North Carolina and Georgia;

(e) enjoins Ellison from selling or servicing Doosan machine tool products in South Carolina, North Carolina, and Georgia;

(f) enjoins Ellison from showing any Doosan machine tool products at the SOUTH-TEC trade show in Charlotte, North Carolina on October 27–29, 2015;

      (g) enjoins Ellison from contacting any of Plaintiff's employees to work for Ellison; and

      (h) enjoins Ellison from making any verbal or written representations, including advertisements, that Ellison is or will be the retailer of Doosan machine tools products in North Carolina, South Carolina, and Georgia.

(ECF No. 15 at 15–16; ECF No. 1-1 at 15–16.)

C.    <u>The Court's Review</u>

23.    In support of its PI Motion, Plaintiff relies on the Affidavit of Frank C. Amick, as CEO of Machinery Solutions, Inc. (ECF No. 4-1), the Complaint (ECF No. 1-1) and its exhibits, and Plaintiff's Memorandum in Support of Motion for Preliminary Injunction (ECF No. 15) and its exhibits, including the Supplemental Affidavit of Frank C. Amick (ECF No. 15-1).

24.    In opposition to the PI Motion, Doosan relies on its Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction (ECF No. 25) and its exhibits, including the Declaration of Tom Lattie, as Vice President of Finance for Doosan Infracore America Corporation (ECF No. 25-1).

25.    Ellison opposes the PI Motion in reliance on its Memorandum Opposing Plaintiff's Motion for Preliminary Injunction (ECF No. 26) and its exhibits, including the Declaration of Amy Odell, as COO and CFO of Ellison (ECF No. 26-1).

26.    The court also heard oral argument from counsel on September 15, 2015 (<u>See</u> ECF Nos. 30 & 31 (Hr'g Tr.).)

27.    The court observes that these documents and testimony provided to date provide factual background/context for the dispute, but Plaintiff has not established each of the requisite elements required by Fed. R. Civ. P. 65 to grant the relief requested in its PI Motion. Therefore,

upon consideration of the above materials, the court finds that Plaintiff has failed to demonstrate that the aforementioned injunction factors require the court to grant the PI Motion, and the PI Motion is denied.

### III.     SPECIFIC FINDINGS AND CONCLUSIONS

A.     <u>Plaintiff Has Not Made a Clear Showing of Likely Success on the Merits at Trial</u>

   i.   *Plaintiff Has Not Established Grounds for an Injunction in North Carolina or Georgia*

28.    Plaintiff seeks to enjoin Doosan from establishing any new dealer, including Ellison, in North Carolina, South Carolina, and Georgia. Plaintiff has not alleged any claims under the laws of North Carolina or Georgia, however. Rather, Plaintiff seeks an injunction in all three states pursuant to South Carolina's Fair Practices of Farm, Construction, Industrial, and Outdoor Power Equipment Manufacturers, Distributors, Wholesalers, and Dealers Act, S.C. Code Ann. §§ 39-6-10 to 39-6-180 (2014) ("S.C. Fair Practices Act").[5]  (ECF No. 31 (Hr'g Tr.) at 14:24–17:18.)

29.    Plaintiff's request for an injunction in North Carolina and Georgia must be denied because the S.C. Fair Practices Act cannot be interpreted to have extraterritorial effect. The court finds controlling authority for this rule in the Fourth Circuit's decision in <u>Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.</u>, 492 F.3d 484 (4th Cir. 2007). As stated in <u>Carolina Trucks</u>:

---

[5] Plaintiff has alleged only one claim against Ellison—civil conspiracy, under the common law of South Carolina. (ECF No. 1-1 at 12–15 ¶¶ 74–88.) During oral argument, Plaintiff's counsel conceded that they are not seeking to enjoin Ellison based on the alleged claim of civil conspiracy. (ECF No. 31 (Hr'g Tr.) at 18:1–9.) Instead, Plaintiff seeks to enjoin Ellison based on the S.C. Fair Practices Act. (<u>Id.</u>)  Because of this concession, the court need not address whether Plaintiff is entitled to an injunction based on the alleged conspiracy claim.

> South Carolina rules of construction provide that statutes must not be read to operate outside the state's borders. The South Carolina Supreme Court has written repeatedly that South Carolina statutes have no extraterritorial effect, because the general rule is that no state . . . can, by its laws, directly affect, bind, or operate upon property or persons beyond its territorial jurisdiction. . . . One state may not project its legislation into another, as the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.

Id. at 489–90. Accordingly, Plaintiff is not entitled to an injunction that operates within North Carolina and Georgia.

30. Nor is Plaintiff entitled to an injunction that restricts sales activity in South Carolina if the transactions take place in North Carolina or Georgia. Again, Carolina Trucks is on point. In that case, the Fourth Circuit refused to enjoin a dealership in Georgia from selling to customers that traveled to the dealership from South Carolina. Id. at 487, 490–94.

31. As Ellison contends that its dealership in North Carolina intends to sell to customers from North Carolina, South Carolina, and Georgia, without establishing a dealership within South Carolina, Carolina Trucks is directly on point. (ECF No. 26-1 at 4 (Odell Dec.) ¶ 9; ECF No. 31 (Hr'g Tr.) at 48:20–21.)

32. Plaintiff argues that Carolina Trucks does not apply because there was no evidence in Carolina Trucks that the South Carolina customers were influenced by the dealer's actions within South Carolina. (ECF No. 31 (Hr'g Tr.) at 15:13–16:20 (presumably referencing Carolina Trucks, 492 F.3d at 487).)

33. Plaintiff's proposed distinction, however, does not nullify the relevant holding by the court in Carolina Trucks that "South Carolina rules of construction provide that statutes must not be read to operate outside the state's borders." Carolina Trucks, 492 F.3d at 489–90.

34. Further, Ellison contends that the distinction is irrelevant to the analysis because

the transactions at issue will take place in its Charlotte, North Carolina office, outside of South Carolina. (ECF No. 31 (Hr'g Tr.) at 48:3–6.)

35.  The court need not address that distinction at this stage because for a preliminary injunction, Plaintiff must make a clear showing that it will likely, not just possibly, succeed on the merits at trial. Real Truth, 575 F.3d at 346. In light of Carolina Trucks, the court finds that Plaintiff has failed to meet that standard for any injunction that enjoins transactions that occur in North Carolina and Georgia.[6]

---

[6] The court further observes that application of the S.C. Fair Practices Act to Georgia and North Carolina implicates the Commerce Clause as described by the United States Supreme Court in Healy v. Beer Inst., Inc., 491 U.S. 324, 336 (1989):

> Taken together, our cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following propositions: First, the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," Edgar v. MITE Corp., 457 U.S. 624, 642-643, 102 S. Ct. 2629, 2640-2641, 73 L. Ed. 2d 269 (1982) (plurality opinion); see also Brown-Forman, 476 U.S., at 581–583, 106 S. Ct., at 2085-2087; and, specifically, a State may not adopt legislation that has the practical effect of establishing "a scale of prices for use in other states," Seelig, 294 U.S., at 528, 55 S. Ct., at 502. Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. Brown-Forman, 476 U.S., at 579, 106 S. Ct., at 2084. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State. Cf. CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 88–89, 107 S. Ct. 1637, 1649-1650, 95 L. Ed. 2d 67 (1987). And, specifically, the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another. Brown-Forman, 476 U.S., at 582, 106 S. Ct., at 2086.

    *ii.    Plaintiff Has Not Established Grounds for an Injunction in South Carolina Due to Unanswered Factual Issues Relevant to the Application of the S.C. Fair Practices Act to the Parties' Distribution Agreement*

36.    Plaintiff also seeks an injunction against Doosan and Ellison in South Carolina pursuant to the S.C. Fair Practices Act. (ECF No. 15 at 15; ECF No. 1-1 at 15–16.)

37.    Doosan terminated the Distribution Agreement pursuant to the provision providing that either party may terminate the agreement, at any time for any reason whatsoever, by giving the other party at least 30 days' prior written notice. (ECF No. 1-1 at 24 ¶ XIII.)

38.    Plaintiff contends that the termination clause in the Distribution Agreement is unenforceable because any termination of the Distribution Agreement is required to comply with the statutory requirements of the S.C. Fair Practices Act.[7] (E.g., ECF No. 15 at 8.) Plaintiff relies on the long-standing principle under South Carolina law that "[e]very contract entered into this state embodies in its terms all applicable laws of the state just as completely as if the contract so stipulated." Ayers v. Crowley, 30 S.E.2d 785 (S.C. 1944) (quoting Inabinet v. Royal Exchange Assurance, 162 S.E. 599, 600 (S.C. 1932)).

39.    To prevail in voiding the termination provision of the Distribution Agreement, Plaintiff must make a clear showing that it is likely to succeed at trial on its claims against Doosan under the S.C. Fair Practices Act. See Real Truth, 575 F.3d at 346.

40.    As a threshold matter, Plaintiff must qualify as a Doosan "dealer" under the S.C. Fair Practices Act to be entitled to the statutory protections it seeks. See, e.g., S.C. Code Ann. §

---

Healy, 491 U.S. at 336.

[7] Under S.C. Code Ann. § 39-6-50(C)(3) (2014) of the S.C. Fair Practices Act, the termination or cancellation of a dealership agreement of a dealer without due cause constitutes unfair competition and an unfair or deceptive act. Moreover, the S.C. Fair Practices Act requires that a manufacturer "shall notify an equipment dealer in writing of the termination or cancellation of the dealership agreement or selling agreement of the dealer at least one hundred eighty days before its effective date, stating the specific grounds for the termination or cancellation." Id. at § 39-6-60.

39-6-130 (2014) (providing protection against termination of a "dealership agreement" without due cause); id. § 39-6-20(3) (2014) (defining "dealership agreement" to require an arrangement with an "equipment dealer").

41. Plaintiff contends "it sells to end users, which puts it squarely within the definition of 'dealer'" under S.C. Code Ann. § 39-6-20 (2014). (ECF No. 15 at 6.)

42. Doosan contends, however, that the S.C. Fair Practices Act is inapplicable to the Distribution Agreement between Plaintiff and Doosan for two independent reasons.

43. First, Doosan contends that Plaintiff's strict construction of the statutory language would include Doosan as a "dealer" under the S.C. Fair Practices Act, which would render that statute inapplicable to the Distribution Agreement because the statute does not apply to an agreement between two dealers. S.C. Code Ann. § 39-6-120 (2014). Specifically, under the plain meaning of the statute, as Plaintiff seeks to apply, any entity that sells machines qualifies as a "dealer." (See ECF No. 15 at 6 ("'Dealer' or 'equipment dealer' means a person who sells or attempts to so effect the sale of equipment . . . ." (citing S.C. Code Ann. § 39-6-20(1) (2014)).) Under this view, Doosan would also qualify as a "dealer" under the plain language of the statute because Doosan also sells machines directly to customers. (ECF No. 25-1 at 3 (Lattie Dec.) ¶ 15.) Consequently, if the court accepts Plaintiff's application of the statute and Doosan also qualifies as a "dealer," Plaintiff's motion for Preliminary Injunction must be denied because the S.C. Fair Practices Act does not control agreements between two dealers. (ECF No. 31 (Hr'g Tr.) at 56:6–57:18 (presumably referring to S.C. Code Ann. § 39-6-120 (2014)).)

44. Second, Doosan directly challenges Plaintiff's contention that it is a "dealer" under the S.C. Fair Practices Act. Doosan contends that the statute cannot be simply applied as written, but instead the court should look at the likely legislative intent.

11

45.     South Carolina law allows courts to look beyond the plain language of a statute to prevent unreasonable results.  "However plain the ordinary meaning of the words used in a statute may be, the courts will reject that meaning when to accept it would lead to a result so plainly absurd that it could not possibly have been intended by the Legislature or would defeat the plain legislative intention."  Kiriakides v. UA Commc'ns, 440 S.E.2d 364, 366 (S.C. 1994).

46.     Doosan contends that the legislative intent of the statute is to protect companies that fit the traditional mold of dealers in that they maintain large and expensive inventory.  (ECF No. 25 at 9–10 (citing Validity and Construction of Statutes Regulating Dealings between Automobile Manufacturers, Distributors, and Dealers, 7 A.L.R.3d 1173).)

47.     Doosan argues that Plaintiff is a distributor, not a dealer, under the statute because Plaintiff does not purchase inventory from Doosan and instead serves as a "pass through" for Doosan machines.  (ECF No. 25 at 9–10.)

48.     Further, Plaintiff is explicitly defined as a "DISTRIBUTOR" in the Distribution Agreement.  (ECF No. 31 (Hr'g Tr.) at 34:12–21 (referring to ECF No. 1-1 at 22).)

49.     If Plaintiff is a distributor, it is fatal to Plaintiff's claim under the S.C. Fair Practices Act because the statute provides exclusive protection to dealers, not distributors.  See, e.g., S.C. Code Ann. § 39-6-130 (2014) (providing protection against termination of a "dealership agreement" without due cause); id. § 39-6-20(3) (2014) (defining "dealership agreement" to require an arrangement with an "equipment dealer").

50.     If the S.C. Fair Practices Act does not apply to the Distribution Agreement or Plaintiff, the Distribution Agreement was effectively terminated by Doosan consistent with the provision providing that either party may terminate the agreement, at any time for any reason whatsoever, by giving the other party at least 30 days' prior written notice.  (ECF No. 1-1 at 24 ¶

XIII.)

51.	In light of the fact that Doosan terminated the agreement consistent with the terms of the Distribution Agreement, and the open questions as to whether the Distribution Agreement is between two dealers and whether Plaintiff qualifies as a "dealer," Plaintiff has not made a clear showing that it is likely to succeed on the merits of its S.C. Fair Practices Act claims at trial.

B.	<u>Plaintiff Has Not Established the Likelihood of Irreparable Harm</u>

52.	Plaintiff contends that it stands to suffer the following, allegedly irreparable harms unless the court enjoins Doosan and Ellison: (a) loss of revenue/profit from sales of new Doosan machines; (b) loss of its ability to warrant and service its customers' current Doosan machines; (c) potential loss of employees through layoffs and recruitment by Ellison; and (d) damage to its reputation and other goodwill among its existing customers. (ECF No. 15 at 9–14.)

*I. Loss of Revenue and Customers*

53.	As a result of the termination of the Distribution Agreement, Plaintiff contends that it will be irreparably harmed because it will lose over 75% of its gross sales if prohibited from selling Doosan machine tools. (ECF No. 15 at 9.)

54.	Plaintiff further contends that it will lose customers that it "spent significant resources" developing over the years. (ECF No. 15 at 11.)

55.	Defendants challenge the premise that Plaintiff will lose the revenue or the customers because it allegedly has other machines from a variety of manufacturers that it will sell and service to make up for any loss associated with termination of the Distribution

Agreement.  (ECF No. 25 at 12–13; ECF No. 25-1 at 5 (Lattie Dec.) ¶ 20, 6 ¶ 23; ECF No. 31 (Hr'g Tr.) at 40:3–41:9.)

56.    Further, Defendants challenge the characterization of this alleged harm as irreparable because Plaintiff can be sufficiently compensated through monetary damages for the lost revenue and the money Plaintiff spent to develop the customer base.  (ECF No. 25 at 13–14; ECF No. 31 (Hr'g Tr.) at 38:24–39:23.)[8]

57.    Because Plaintiff can be arguably compensated through monetary damages and because Plaintiff arguably is able to continue its business through the sale of other competitive products, Plaintiff has not made a clear showing it will likely suffer irreparable harm absent an injunction.  "Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp., 17 F.3d 691, 694 (4th Cir. 1994).[9]

---

[8] Plaintiff cited a temporary restraining order entered against Doosan under similar circumstances in Louisiana state court as evidence of its likelihood of success on the merits here.  (ECF No. 15 at 9 and 41–42.)  The Louisiana action, however, does not support Plaintiff's request here.  The Louisiana action was removed to the United States District Court for the Eastern District of Louisiana, and one day after oral argument in this action, the Eastern District of Louisiana issued an order **denying a preliminary injunction against Doosan**.  H&S Mach. Corp. v. Doosan Infracore Am. Corp., No. 15-3924-HGB-MBN (E.D. La. Sept. 16, 2015) (ECF No. 31).  The Eastern District of Louisiana denied the preliminary injunction in part because of the "availability of monetary damages" available to the terminated plaintiff.

[9] The United States Court of Appeals for the Fourth Circuit has made clear that a preliminary injunction is an "extraordinary remedy."  Federal Leasing, Inc. v. Underwriters at Lloyd's, 650 F.2d 495, 499 (4th Cir. 1981).  The presumption against issuing preliminary injunctions where a harm suffered can be remedied by money damages at judgment stems from real concerns the issuance of a preliminary injunction remedy raises.  These concerns include, for example, the fact that in issuing a preliminary injunction order, a district court is required, based on an incomplete record, to order a party to act in a certain way.  Hughes Network Sys., Inc., 17 F.3d at 693–94.  Issuing a preliminary injunction further risks repetitive litigation, that which carries significant costs for both parties.  Id.  (noting that because a preliminary injunction is an appealable order, the claim can be "litigated and appealed for purposes of the preliminary injunction, and then again for purposes of the final decision on the merits").  It is a fundamental principle of longstanding jurisprudence that a request for an injunction will not be granted as

*II. Loss of Employees*

58. Plaintiff contends that it will be irreparably harmed because it might lose highly trained employees to layoffs or poaching by Ellison. (E.g., ECF No. 15 at 10–11.)

59. Plaintiff did not present any evidence that Ellison has approached Plaintiff's employees since being appointed a Doosan dealer.

60. Plaintiff did not present any evidence that it could not replace the lost Doosan sales with sales of products of the other manufacturers that Plaintiff is authorized to represent.

61. Similar to the alleged downturn in revenue, the time and money invested in training employees is not an irreparable harm because Plaintiff can be sufficiently compensated through monetary damages. (ECF No. 25 at 13–14; ECF No. 31 (Hr'g Tr.) at 38:24–39:23.)

62. Because the lost investment in training employees can be sufficiently compensated through monetary damages, and because Plaintiff could arguably shift its workforce to selling and repairing of other competitive products, Plaintiff has not made a clear showing it will likely suffer irreparable harm absent an injunction.

*III. Loss of Warranty and Service Contracts*

63. Plaintiff contends that it will be irreparably harmed because Plaintiff will be "exposed to potential litigation from its customers for failing to abide by the terms of the [warranty] agreements each customer had with MSI when purchasing new Defendant DIAC equipment." (ECF No. 15 at 13.)

---

long as an adequate remedy at law is available. See, e.g., Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 57 (1975). Thus, those "extraordinary circumstances" that may give rise to the irreparable harm required for a preliminary injunction when a loss can be compensated by money damages are "quite narrow." Hughes Network Sys., Inc., 17 F.3d at 694 (discussing a defendant's insolvency or a plaintiff's business not being able to survive as examples of such circumstances).

15

64. Similar to Plaintiff's other alleged damages, the price paid for the extended warranties that customer may seek back from Plaintiff as a refund if the Distribution Agreement is terminated is easily quantified and can be sufficiently compensated through monetary damages.

65. Because the price of the warranty contracts can be sufficiently compensated through monetary damages, Plaintiff has not made a clear showing it will likely suffer irreparable harm absent an injunction.

C.    Balance of Equities and Public Interest Factors

66. Because Plaintiff has failed to clearly show likelihood of success on the merits and likelihood of irreparable harm, this court, as stated above, need not address the "balance of equities" and "public interest" elements required for preliminary injunction. Real Truth, 575 F.3d at 346.

## IV.    CONCLUSION

For the foregoing reasons and after careful consideration of the entire record, the court hereby **DENIES** Machinery Solutions, Inc.'s Motion for Preliminary Injunction.[10]  (ECF No. 4.)

**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

September 18, 2015
Columbia, South Carolina

---

[10] The court notes that the S.C. Fair Practices Act permits injunctive relief under circumstances wherein a manufacture is required to provide a dealer with 180 days' notice of the termination or cancellation of a dealer agreement. See S.C. Code Ann. § 39-6-60(C) (2014).  However, even this relief must comply with requirements of the Rules of Civil Procedure. Id.